UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
RENTRAK CORPORATION,

                    Plaintiff,

          -against-                        MEMORANDUM & ORDER
                                           12-CV-1576(JS)(ARL)
FRED HANDSMAN,

                    Defendant.
--------------------------------------X
APPEARANCES
For Plaintiff:      Bernard D'Orazio, Esq.
                    Law Offices of Bernard D'Orazio, P.C.
                    100 Lafayette Street, Suite 601
                    New York, NY 10013

For Defendant:      Rex Whitehorn, Esq.
                    Rex Whitehorn & Associates, P.C.
                    11 Grace Avenue, Suite 411
                    Great Neck, NY 11021

SEYBERT, District Judge:

          Currently before the Court are the parties' cross-

motions for summary judgment.  For the following reasons, both

motions are GRANTED IN PART and DENIED IN PART.

BACKGROUND[1]

I.   The Parties

          Plaintiff Rentrak Corporation ("Rentrak" or "Plaintiff")

is an Oregon corporation that leases home entertainment products

(e.g., DVDs and video games) to third-party retailers for use as

_____

[1] The following facts are drawn from the parties' Local Rule 56.1
Statements and their affidavits and evidence in support.  Any
factual disputes will be noted.

rentals in their video rental stores.  (Pl.'s 56.1 Stmt., Docket
Entry 23-1, ¶ 1; Murphy Decl., Docket Entry 23-3, ¶ 2.)  Defendant
Fred Handsman ("Handsman" or "Defendant") was the president and
majority shareholder of Video U.S.A. Entertainment, Inc. ("Video
USA"), a now-defunct, New York corporation that operated a chain
of video rental stores.  (Pl.'s 56.1 Stmt. ¶ 2; Def.'s 56.1
Counterstmt., Docket Entry 26-1, ¶ 2.)

II.  The Rentrak Agreement

On June 5, 2001, Video U.S.A. and Rentrak entered into
a contract pursuant to which Rentrak leased its home entertainment
products to Video U.S.A. so that Video U.S.A. could then rent them
to its customers at its rental stores (the "Rentrak Agreement").
(Pl.'s 56.1 Stmt. ¶ 4; Murphy Decl. Ex. F, Docket Entry 23-11.)
Handsman signed the Rentrak Agreement solely in his capacity as
president of Video U.S.A.; he did not personally guarantee the
Rentrak Agreement.   (Murphy Decl. Ex. F at 2[2]; Handsman Aff.,
Docket Entry 26 at 12[3], ¶¶ 3-7.)

Under the Rentrak Agreement, if Video U.S.A. rented a
particular title, it was required to share the rental fee revenue

---

[2] For the purposes of this Memorandum and Order, if the Court is
required to refer to page numbers of the parties' exhibits, the
Court will use the page numbers provided by the Electronic Case
Filing system.

[3] This page number refers to the page number supplied by the
Electronic Case Filing system.

with Rentrak. (Pl.'s 56.1 Stmt. ¶ 5; Murphy Decl. Ex. F § 5.)
Rentrak would set the particular lease term for each title at the
time Video U.S.A. placed an order for that particular title.
(Murphy Decl. ¶ 4 n.2.) During each title's individual lease term,
Video U.S.A. was required to keep the physical copies of the title
at its rental store and use its best efforts to rent them to its
customers. (Pl.'s 56.1 Stmt. ¶ 5; Murphy Decl. Ex. F § 2.2)
However, the Rentrak Agreement also granted Video U.S.A. a limited
right to sell each title at certain times during its lease period,
but not until the "Sell Through Date" of the title was reached,
which was set by Rentrak and varied for each title. (Pl.'s 56.1
Stmt. ¶ 7; Murphy Decl. ¶¶ 8, 10-12, Ex. F § 2.3.) In addition,
Video U.S.A. had the option to purchase each title at the end of
its lease term, but if Video U.S.A. elected not to purchase the
title, it had to return the copies of it to Rentrak. (Pl.'s 56.1
Stmt. ¶ 12; Murphy Decl. Ex. F §§ 2.4, 7.2.)

The Rentrak Agreement required Video U.S.A. to
"immediately notify Rentrak in writing whenever [Video
U.S.A.] . . . ceas[ed] ownership, control or operation of a Store."
(Murphy Decl. Ex. F § 1.3.) In addition, the Rentrak Agreement
explicitly provided that Video U.S.A. would be in default if
it: (1) failed to pay amounts owed under the Rentrak Agreement,
(2) closed its stores, or (3) did not conduct business for seven
or more consecutive days. (Murphy Decl. Ex. F §§ 8.1.1-8.1.2.)

The Rentrak Agreement further required Video U.S.A. to use a "point-of-sale" computer system (the "POS System") to track and report to Rentrak all rentals and sales of Rentrak's titles. (Pl.'s 56.1 Stmt. ¶ 5; Murphy Decl. Ex. F § 1.)  Video U.S.A. was required to process all transactions through the POS System and provide to Rentrak daily reports for all rentals and sales. (Pl.'s 56.1 Stmt. ¶ 5; Murphy Decl. Ex. F § 1.1.5)  The POS System gave Rentrak instantaneous remote access to Video U.S.A.'s daily sales and rental activities.  (Handsman Aff. ¶ 10.)

Under the Rentrak Agreement, in the event of default or breach of the agreement by Video U.S.A., Rentrak had the option to terminate the agreement or suspend Video U.S.A.'s rights under the agreement, in which case Video U.S.A. would have to return all titles to Rentrak:

> 8.2 If you default, we shall be entitled to take one or more of the following steps . . .
>
> 8.2.1 Terminate our Agreement with you.  If we terminate this Agreement you will pay all amounts owed to us and return at your expense all PPT Cassettes[4] in your possession within ten (10) days.
>
> 8.2.2 Suspend your rights under this Agreement, require you to pay all amounts you owe us within ten (10) days and/or require you to return at your expense all PPT Cassettes in your possession within ten (10) days.

---

[4] Rentrak previously referred to its home entertainment products as Cassettes.  Rentrak now refers to them as "Units."  (Murphy Decl. ¶ 2.)

(Murphy Decl. Ex. F §§ 8.2-8.2.2.)  The Rentrak Agreement also contained a liquidated damages provision in the event that Video U.S.A. failed to return titles in accordance with section 8.2:

> If you do not return PPT Cassettes or the PPT Cassettes are not returned in good condition, then you will be required to pay us $65 per PPT Cassette if we requested return of the Cassette within ninety days of the title's street date and $30 per PPT Cassette if the request is made more than ninety days after the title's street date.

(Murphy Decl. Ex. F § 8.2.3.)  In addition, while either party could terminate the Rentrak Agreement with written notice to the other, the Rentrak Agreement explicitly stated that the term of the Rentrak Agreement would not end until "after (i) all of [Video U.S.A.'s] obligations under [the Rentrak] Agreement [were] satisfied and (ii) ninety (90) days after the last day of the last lease term of the PPT Cassettes ordered by [Video U.S.A.]."  (Murphy Decl. Ex. F § 7.1.)

Finally, the Rentrak Agreement also contained a provision requiring Video U.S.A. to hold in trust Rentrak's share of the revenue derived from Video U.S.A.'s sales and rentals of Rentrak's product:

> 9.7 . . . You have a fiduciary duty to us to hold and remit all fees and charges to us and to report to Rentrak in accordance with the terms of this Agreement.  You agree to hold in trust for us our share of the rental and sales proceeds you receive.

(Murphy Decl. Ex. F § 9.7.)

III. <u>Video U.S.A.'s Default</u>

As a result of competition with new home entertainment services such as Netflix and Redbox, Video U.S.A. encountered financial trouble in late 2009 and started closing unprofitable stores and liquidating inventory. (Handsman Dep., Docket Entries 23-6 to 23-8, at 25, 31.) Video U.S.A. also fell behind on its revenue payments to Rentrak. (Murphy Decl. ¶ 15.) On October 29, 2009, Sally Tedford ("Tedford"), Rentrak's Credit Service Group Leader, emailed Handsman with a proposed payment plan that would bring Video U.S.A.'s account current within one year. (Murphy Decl. Ex. G, Docket Entry 23-12.) Handsman responded on November 2, 2009 and told Tedford he would get back to her after Video U.S.A.'s accountants and attorneys had reviewed the proposal. (Murphy Decl. Ex. G.) There is no evidence in the record that Handsman or anyone else at Video U.S.A. ever got back to Tedford or anyone else at Rentrak regarding the proposed payment plan.

In early November 2009, Rentrak learned that four of the six remaining Video U.S.A. stores had refused shipments of new titles from Rentrak and that Video U.S.A. had closed one of the stores without notifying Rentrak. (Murphy Decl. ¶ 17.) On November 13, 2009, Taryn McCauley ("McCauley"), a Rentrak account representative for Video U.S.A., e-mailed Handsman, stating: "In tracking the shipments today I found that four of the remaining

six stores refused their shipments . . . . I spoke to Joe at store
40 and he informed me the store closed on Monday.  Are you closing
additional stores?"  (Murphy Decl. Ex. I, Docket Entry 23-14.)
Handsman responded by e-mail later that day.  He acknowledged that
"store 40" had closed and informed McCauley that two other stores
would close the week after:  "Yes-very last minute, 43 and 48 are
open, but will be closed Tuesday, THEY know nothing right NOW, our
DM does . . . . . office is closed today.  (Murphy Decl. Ex. I
(capitalization and ellipses in the original).)

        Realizing that Video U.S.A. was going out of business,
Rentrak sent Handsman a notice of default on November 17, 2009 and
demanded full payment of Video U.S.A.'s past due balance of
$79,590.75 in revenue sharing funds.  (Murphy Decl. Ex. J, Docket
Entry 23-15.)  Rentrak sent Handsman a second notice that same day
demanding that Video U.S.A. not sell any of Rentrak's product:
"As Rentrak has declared a default in the Agreement, Video U.S.A.
Entertainment is cautioned to immediately pull any product
currently being offered for sale and to immediately cease selling
any Rentrak units in any liquidation or going out of business
sale." (Murphy Decl. Ex. K, Docket Entry 23-16.)  In this notice,
Rentrak also reminded Handsman that the Rentrak Agreement required
Video U.S.A. to hold Rentrak's portion of the revenue sharing funds
in trust and also warned Handsman that he would be subject to

personal liability if he directed the conversion of Rentrak's funds:

> Our records indicate that Video USA Entertainment, Inc., is in default of the Rentrak Agreement for failure to remit Rentrak's portion of the revenue sharing proceeds generated from the use of our property and had been properly noticed of the Default in the Agreement. Please be advised that Video USA Entertainment has a fiduciary duty to Rentrak to hold Rentrak's revenue sharing funds in trust. These funds are the property of Rentrak and not of Video USA. Failure to hold these funds in trust, misappropriation and/or converting these funds for other purposes may subject you to immediate legal action and possibly personal liability for directing the conversion.

(Murphy Decl. Ex. K.) That same day, McCauley also e-mailed Handsman to "notify [him] and make sure [he was] not liquidating any of the Rentrak product." (Murphy Decl. Ex. L, Docket Entry 23-17.) McCauley further stated that "[i]f the stores are closed, all remaining Rentrak inventory must be boxed up to be shipped back." (Murphy Decl. Ex. L, Docket Entry 23-18.) There is no evidence in the record that Handsman or anyone else at Video U.S.A. ever responded to Rentrak's notices or McCauley's e-mail.

On November 20, 2009, Rentrak sent Handsman an additional notice "terminating all ordering privileges [and] demanding return of all Rentrak PPT product and payment of all outstanding balances." (Murphy Decl. Ex. M, Docket Entry 23-18.) The notice further stated "**DO NOT sell or convert any PPT product**"

and that if Rentrak's product was not returned within fifteen days, "Video U.S.A. [would] be charged the contractual price for each item . . . ." (Murphy Decl. Ex. M (emphasis in the original).) On November 25, 2009, Rentrak sent Handsman a final notice demanding that Video U.S.A. cease all sales and rentals of Rentrak's product. (Murphy Decl. Ex. N, Docket Entry 23-19.) Rentrak again warned Handsman that "[m]isappropriation and/or converting Rentrak property for other purposes may subject [Handsman] to immediate legal action and possibly personal liability for directing the conversion." (Murphy Decl. Ex. N.)

According to Rentrak, as of November 20, 2009, Video U.S.A. had over 20,000 units of Rentrak product in its possession. (Murphy Decl. ¶ 23.) However, despite Rentrak's repeated demands that Video U.S.A. cease sales and return its product, Handsman, as president of Video U.S.A., personally decided to close down the remaining stores and liquidate Rentrak's product. Handsman then used the sale proceeds to pay off other creditors and company expenses, some of which included debts that Handsman had personally guaranteed and various forms of Handsman's compensation. (Handsman Dep. at 72-73; Handsman Aff. ¶ 15; Pl.'s 56.1 Stmt. ¶ 14.) Video U.S.A. ultimately went out of business without remitting any portion of the liquidation proceeds to Rentrak. In addition, at the time Video U.S.A. went out of business, a report generated through the POS System showed that Video U.S.A. owed

Rentrak $124,059.31 in revenue sharing funds.  (Murphy Decl. ¶ 25, Ex. O, Docket Entry 23-20.)  Video U.S.A. never remitted this amount either.

IV.  The Oregon Action

In 2010, Rentrak sued Video U.S.A. in the United States District Court for the District of Oregon (the "Oregon Action"). (Pl.'s 56.1 Stmt. ¶ 16; Murphy Decl. ¶ 26, Ex. P, Docket Entry 23-21.)  In the Oregon Action, Rentrak alleged that Video U.S.A. had breached the Rentrak Agreement and sought damages based on the liquidated damages clause in section 8.2.3 of the Rentrak Agreement.  (Murphy Decl. ¶ 27, Ex. Q.)  Video U.S.A. did not appear in the Oregon Action and the Oregon court entered a monetary judgment against Video U.S.A. and in favor of Rentrak.  (Pl.'s 56.1 Stmt. ¶¶ 17-18; Murphy Decl. ¶ 26, Ex. P.)  Through post-judgment discovery conducted in Oregon and New York, Rentrak discovered that Video U.S.A. had no assets from which to satisfy the judgment.  (Murphy Decl. ¶ 28.)

V.  The Instant Action

Unable to collect on the Oregon judgment against Video U.S.A., Rentrak commenced this action against Handsman on March 30, 2010.  (Docket Entry 1.)  The Amended Complaint states claims for conversion, unjust enrichment, breach of fiduciary duty, money had and received, and punitive damages.  (Docket Entry 5.)  Rentrak alleges that Handsman used the funds generated from the liquidation

of Rentrak's product and Rentrak's portion of revenue sharing funds in part (1) to satisfy debts that Handsman personally guaranteed; (2) to pay his salary, whole life insurance policy premiums, expenses, and other forms of compensation; and (3) to pay amounts that were unsupported by any invoices to Video U.S.A.'s accountant. (Am. Compl. ¶ 17; Murphy Decl. ¶ 28.)

On June 13, 2012, Handsman answered the Amended Complaint and asserted two counterclaims for attorney's fees, the first pursuant to section 9.5 of the Rentrak Agreement and the second based "upon the frivolous litigation commenced by [Rentrak] herein." (Ans. & Countercls., Docket Entry 12, ¶¶ 58-61.)

On June 30, 2013, Rentrak moved for partial summary judgment. (Docket Entry 23.) On July 3, 2013, Handsman opposed and filed a cross-motion for summary judgment. (Docket Entry 26.) These motions are currently pending before the Court.

DISCUSSION

Rentrak moves for: (1) partial summary judgment as to liability on its conversion claim and (2) summary judgment as to liability and damages on its breach of fiduciary duty claim. (See Not. of Motion, Docket Entry 23.) Handsman has cross-moved for: (1) summary judgment on Rentrak's conversion, unjust enrichment, and breach of fiduciary duty claims and (2) an award of attorneys' fees. (See Not. of Motion, Docket Entry 26; see generally Def.'s Reply Br., Docket Entry 28.) The Court will first

address the applicable standard of review before turning to the parties' motions.

I.   Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).

"The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment." Id.; see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). A genuine factual issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. To defeat summary judgment, "the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)

12

(quoting Anderson, 477 U.S. at 256).  "[M]ere speculation or conjecture as to the true nature of the facts" will not overcome a motion for summary judgment.  Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986); see also Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986) ("Mere conclusory allegations or denials will not suffice." (citation omitted)); Weinstock, 224 F.3d at 41 ("[U]nsupported allegations do not create a material issue of fact.").

"The same standard applies where, as here, the parties filed cross-motions for summary judgment . . . ."  Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citing Terwilliger v. Terwilliger, 206 F.3d 240, 244 (2d Cir. 2000)).  Thus, even if both parties move for summary judgment and assert the absence of any genuine issues of material fact, "a district court is not required to grant judgment as a matter of law for one side or the other."  Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993).  "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  Morales, 249 F.3d at 121 (citation omitted).

II. Rentrak's Conversion Claim

Rentrak first moves for partial summary judgment as to liability on its conversion claim against Handsman.  Rentrak argues that Handsman is personally liable for conversion of Rentrak's

product and its revenue sharing funds because Handsman personally directed the liquidation of Rentrak's inventory and used the liquidation proceeds and the $124,059.31 in revenue sharing funds to pay off Video U.S.A.'s creditors and his own personal obligations and expenses. (See Pl.'s Br., Docket Entry 24-1, at 14-19; see also Pl.'s Reply Br., Docket Entry 27, at 6 n.2.) Handsman has cross-moved for summary judgment on the conversion claim arguing: (1) that he cannot be liable for conversion because he did not personally guarantee the contract from which the conversion claim arises; and (2) that Rentrak's conversion claim is duplicative of Rentrak's prior breach of contract claim against Video U.S.A. in the Oregon Action. (Whitehorn Affirm., Docket Entry 26, ¶¶ 9-12; Def.'s Reply Br., Docket Entry 28, at 1-2.) As discussed below, the Court finds that summary judgment in favor of Rentrak is appropriate here.

Handsman's first argument--that he cannot be held liable on Rentrak's conversion claim because he did not personally guarantee the Rentrak Agreement--is easily dismissed. It is true under New York law[5] that "[c]orporate officers may not be held

---

[5] The Rentrak Agreement contains an Oregon choice-of-law provision. (Murphy Decl. Ex. F § 9.5 ("This Agreement is and shall be . . . interpreted and enforced in accordance with the laws of the State of Oregon applicable to contracts to be made and to be performed entirely within this state.").) However, Rentrak asserts that New York law applies to the conversion claim because the alleged conversion of Rentrak's product occurred in New York. (Pl.'s Br. at 14 n.7.) Handsman does not

14

personally liable on contracts of the corporation where they did not purport to bind themselves individually." Lichtman v. Mount Judah Cemetary, 269 A.D.2d 319, 320, 705 N.Y.S.2d 23, 25 (1st Dep't 2000) (citing Westminster Constr. Co. v. Sherman, 160 A.D.2d 867, 868, 554 N.Y.S.2d 300, 301 (2d Dep't 1990)); accord W.B. David & Co., Inc. v. DWA Commc'n, Inc., No. 02-CV-8479, 2004 WL 369147, at *3 (S.D.N.Y. Feb. 26, 2004). However, "[a] corporate officer may be liable for torts committed by or for the benefit of the corporation if the officer participated in their commission." PDK Labs, Inc. v. G.M.G. Trans W. Corp., 101 A.D.3d 970, 973, 957 N.Y.S.2d 191, 195 (2d Dep't 2012) (quoting Hamlet at Willow Creek Dev. Co. v N.E. Land Dev. Corp., 64 A.D.3d 85, 116, 878 N.Y.S.2d 97, 119 (2d Dep't 2009)); accord Key Bank of N.Y. v. Grossi, 227 A.D.2d 841, 843, 642 N.Y.S.2d 403, 404 (3d Dep't 1996) ("Personal liability will be imposed, however, upon corporate officers who commit or participate in the commission of a tort, even if the commission or participation is for the corporation's benefit."); see also FLB, LLC v. Cellco P'ship, 536 F. App'x 132, 133 (2d Cir. 2013) ("[A] corporate officer who participates in the commission

---

dispute this, and the Court agrees. See Lund's Inc. v. Chem. Bank, 870 F.2d 840, 845 (2d Cir. 1989) (applying New York law to claim of conversion that took place in New York because "[a]s the New York Court of Appeals has stated, 'lex loci delicti remains the general rule in tort cases . . . .'" (quoting Cousins v. Instrument Flyers, Inc., 44 N.Y.2d 698, 699, 376 N.E.2d 914, 915, 405 N.Y.S.2d 441, 442 (1978) (per curiam))).

of a tort may be held individually liable, . . . regardless of whether the corporate veil is pierced." (quoting <u>Fletcher v. Dakota, Inc.</u>, 99 A.D.3d 43, 49, 948 N.Y.S.2d 263, 267 (1st Dep't 2012) (alteration and ellipses in original) (internal quotation marks and citation omitted))).  Thus, the fact that Handsman did not personally guarantee the Rentrak Agreement is not, in and of itself, a barrier to Rentrak's conversion claim.  Rather, the issue is whether Rentrak has established that Handsman converted Rentrak's property and share of revenue.  As discussed below, the Court finds that it has.

"A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession."  <u>Colavito v. N.Y. Organ Donor Network, Inc.</u>, 8 N.Y.3d 43, 49-50, 860 N.E.2d 713, 717, 827 N.Y.S.2d 96, 100 (2006) (citing <u>State v. Seventh Regiment Fund</u>, 98 N.Y.2d 249, 260, 774 N.E.2d 702, 710, 746 N.Y.S.2d 637, 645 (2002)); <u>accord</u> <u>Bank of Am. Corp. v. Lemgruber</u>, 385 F. Supp. 2d 200, 222 (S.D.N.Y. 2005).  The New York Court of Appeals has stated that there are two elements of conversion:  "(1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights."  <u>Colavito</u> 8 N.Y.3d at 50, 860 N.E.2d at 717, 827 N.Y.S.2d at 100 (internal citations omitted).  However, a plaintiff need

not demonstrate wrongful intent in order to prevail on a conversion claim. T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A., No. 10-CV-2842, 2010 WL 4038826, at *8 (E.D.N.Y. Oct. 14, 2010) (quoting LoPresti v. Terwilliger, 126 F.3d 34, 42 (2d Cir. 1997) ("Wrongful intent simply is not an element of an otherwise valid conversion claim.")); Pokoik v. Gittens, 171 A.D.2d 470, 471, 567 N.Y.S.2d 49, 49 (1st Dep't 1991) ("[A] cause of action for conversion need not allege or prove a tortious taking or even that defendants acted in bad faith."). In addition, "[w]here the original possession is lawful, a conversion does not occur until the defendant refuses to return the property after demand or until he sooner disposes of the property." Schwartz v. Capital Liquidators, Inc., 984 F.2d 53, 54 (2d Cir. 1993) (quoting Johnson v. Gumer, 94 A.D.2d 955, 955, 464 N.Y.S.2d 318, 319 (4th Dep't 1983)). Moreover, where the property at issue is money, the money "must be specifically identifiable and be subject to an obligation to be returned or to be otherwise treated in a particular manner." Key Bank, 227 A.D.2d at 843, 642 N.Y.S.2d at 405 (citing Republic of Haiti v. Duvalier, 211 A.D.2d 379, 384, 626 N.Y.S.2d 472, 475 (1st Dep't 1995)).

"A corporate officer or employee who participates in a conversion in the course of his employment may be held personally liable for his acts, notwithstanding innocent intent." Fashions Outlet of Am., Inc. v. Maharaj, No. 88-CV-7231, 1991 WL 143421, at *5 (S.D.N.Y. July 22, 1991); see, e.g., Aeroglide Corp v. Zeh, 301

17

F.2d 420, 422 (2d Cir. 1962) (finding directors who voted for and signed mortgage as to equipment personally liable for converting property of manufacturer who retained property's title); KOUS-TV, Inc., v. Spot Time, Ltd., 599 F. Supp. 90, 92 (S.D.N.Y. 1984) (finding president of defendant company who endorsed and cashed two checks payable to plaintiff on defendant company's behalf personally liable for conversion of the checks); Key Bank, 642 N.Y.S.2d at 404, 227 A.D.2d at 842-43 (finding two corporate officers who used proceeds from sale owing to plaintiff to pay company's creditors personally liable for conversion of sale proceeds). In addition, "[c]orporate officers also may be personally liable for trust funds otherwise wrongfully diverted by their corporation, provided that they knowingly participated in that diversion by the corporation." Edgewater Constr. Co. v. 81 & 3 of Watertown, Inc., 1 A.D.3d 1054, 1057, 769 N.Y.S.2d 343, 346 (4th Dep't 2003).

However, even if a plaintiff meets all of the elements of a conversion claim, the claim "cannot be validly maintained where damages are merely being sought for breach of contract." ESI, Inc. v. Coastal Power Prod. Co., 995 F. Supp. 419, 433 (S.D.N.Y. 1998) (quoting Peters Griffin Woodward, Inc. v. WCSC, Inc., 88 A.D.2d 883, 884, 452 N.Y.S.2d 599, 600 (1st Dep't 1982)). Thus, "[w]here a conversion claim is grounded in a contractual dispute, the plaintiff 'must show acts that were unlawful or

wrongful as opposed to mere violations of contractual rights.'"
In re Refco Sec. Litig., 759 F. Supp. 2d 301, 327 (S.D.N.Y. 2010)
(quoting Moses v. Martin, 360 F. Supp. 2d 533, 541 (S.D.N.Y.
2004)); Peters Griffin, 452 N.Y.S.2d at 600, 88 A.D.2d at 884.

Here, the Court finds that Rentrak has established the
elements of conversion and also has shown that Handsman's actions
amounted to more than a mere violation of Rentrak's contractual
rights.  First, it cannot be disputed that Rentrak had possessory
interests in the products it leased to Video U.S.A. and the revenue
sharing funds Video U.S.A. generated through the rentals and sales
of Rentrak's products.  The Rentrak Agreement specifically
provided that Rentrak leased, but did not sell, the product to
Video U.S.A.:  "We and you intend this Agreement shall constitute
a true lease of Cassettes between you as lessee and us as lessor."
(Murphy Decl. Ex. F § 9.7.)  In addition, the Rentrak Agreement
specifically required Video U.S.A. to hold in trust Rentrak's
portion of the revenue sharing funds generated by the sales and
rentals of its products:  "You agree to hold in trust for us our
share of the rental and sales proceeds you receive." (Murphy Decl.
Ex. F § 9.7.)

Second, even though the Rentrak Agreement granted Video
U.S.A. a limited right to sell Rentrak's product at certain times
during each product's lease term, Rentrak sent Handsman several
notices and e-mails in November 2009 that unequivocally

(1) terminated Video U.S.A.'s right to sell Rentrak's products, (2) demanded the return of all Rentrak product, and (3) demanded payment of Rentrak's portion of the revenue sharing funds. Rentrak also warned Handsman that if he continued to close Video U.S.A.'s stores and liquidate Rentrak's product, Rentrak would consider Handsman's actions to be a conversion of Rentrak's property. Yet, Handsman personally decided to close Video U.S.A.'s stores, authorized the liquidation of Rentrak's property, and then used the sale proceeds to pay other creditors and debts, including a large debt that Handsman had personally guaranteed.

Third, with respect to the two additional requirements for conversion of money, the Court finds that the revenue sharing funds that Rentrak claims Handsman converted are "specifically identifiable," as Video U.S.A.'s own POS System report showed that Video U.S.A. owed Rentrak $124,059.31 in revenue sharing funds. Moreover, Handsman clearly had an obligation to remit the funds to Rentrak because Rentrak specifically demanded that Handsman do so pursuant to the Rentrak Agreement.

Contrary to Handsman's contention, although Video U.S.A. clearly breached the Rentrak Agreement, the Court finds that Handsman's actions were more than just a mere violation of Rentrak's contractual rights. Rather, the facts clearly establish that Handsman exercised dominion and control over Rentrak's property such that he used the proceeds to pay, not only Video

U.S.A.'s creditors, but also debts that he had personally guaranteed. This evidence is sufficient under New York law to establish a conversion claim separate and apart from any breach of contract claim. Key Bank of New York v. Grossi, 227 A.D.2d 841, 642 N.Y.S.2d 403 (3d Dep't 1996) is instructive and directly on point. In Key Bank, the plaintiff entered into a contract with Quintro Corporation ("Quintro"), a third-party company, for the storage and sale of vehicles and boats the plaintiff had repossessed in connection with the enforcement of its security interests in the vehicles. Id. at 404, 227 A.D.2d at 842. Under the agreement, Quintro was to sell the vehicles and remit the sale proceeds to the plaintiff. Id. However, Quintro began experiencing financial difficulties and used the sale proceeds to pay its creditors. Id. The plaintiff then sued two of Quintro's corporate officers for conversion but did not sue Quintro. Id. The court held that, even though Quintro's failure to remit the sale proceeds constituted a breach of contract, the corporate officers were personally liable for conversion of the sale proceeds because they "exercised dominion and control over the proceeds in such a manner that the proceeds were used to pay customers or creditors of Quintro other than plaintiff." Id. at 405, 227 A.D.2d at 844. The court found that such evidence was sufficient to establish a cause of action for conversion separate and apart from any breach of contract. Id.; see also Aeroglide, 301 F.2d at 422

(finding directors who voted for and signed mortgage contract as to equipment personally liable for converting property of manufacturer who retained property's title).

Here, like in Key Bank, there is no question that Handsman participated in an act of conversion and was involved in all of the relevant transactions. Although Handsman has submitted an affidavit stating that he "never personally performed a single sale of any [Rentrak product], nor [had he] converted or handled the monies received from said sales," (Handsman Aff. ¶ 16), Handsman testified during his deposition that he was the only person at Video U.S.A. with authority to close stores or direct the liquidation of inventory. (Handsman Dep. at 64-65 (testifying, when asked if anyone else besides him had authority to close a store: "I was the last straw, the buck ended with me."); Handsman Dep. at 65 (testifying, when asked if anyone else besides him had authority to liquidate inventory: "I would have to say no.").) Handsman also claims in his affidavit that "the proceeds of the sales of [Rentrak's product] were applied to pay creditors exactly as Video U.S.A. previously paid its creditors in the past," and that "[u]nfortunately, during the closing down of the stores, the ultimate proceeds generated were insufficient to pay off all creditors, including [Rentrak]." (Handsman Aff. ¶ 15.) However, Handsman testified at his deposition that Handsman and Jeffrey Goldstein ("Goldstein") met to discuss which creditors they would

pay and that Handsman and Video U.S.A.'s bookkeeper made the "ultimate decisions" regarding payment to creditors when Video U.S.A.'s stores were closing. (Handsman Dep. at 76-77.) In addition, Goldstein testified that Goldstein and Handsman discussed that Handsman would liquidate inventory to pay off Video U.S.A.'s creditors. (Goldstein Dep., Docket Entry 23-9, at 60.) Moreover, Goldstein also testified that the criteria for determining which obligations to pay was to "[p]ay off all personal obligations." (Goldstein Dep. at 88.) In sum, the record demonstrates that Handsman directed the liquidation of Rentrak's inventory and used the proceeds to satisfy his own personal obligations and to pay creditors other than Rentrak. Thus, Handsman is personally liable for the conversion of Rentrak's inventory and the $124,059.31 in revenue sharing funds that Video U.S.A. was supposed to hold in trust for Rentrak. Accordingly, Rentrak's motion for partial summary judgment with respect to its conversion claim is GRANTED[6] and Handsman's motion for summary judgment on the claim is DENIED.

---

[6] However, Rentrak's request that the Court schedule a hearing to determine the fair market value of the converted product is DENIED. The Court fails to see how the issue of liability in this case is not a question for a jury, and Rentrak cites no caselaw in support of its request.

III. Unjust Enrichment

Handsman cross-moves for summary judgment on Rentrak's unjust enrichment claim. Rentrak has not moved for summary judgment with respect to this claim, nor does Rentrak oppose Handsman's cross-motion on this claim. As discussed below, the Court finds that summary judgment in Handsman's favor is appropriate on the unjust enrichment claim.

"Unjust enrichment is a quasi contract claim, and the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." Feigen v. Advance Capital Mgmt. Corp., 150 A.D.2d 281, 283, 541 N.Y.S.2d 797, 799 (1st Dep't 1989) (internal quotation marks and citation omitted). Moreover, New York law is well settled that "a nonsignatory to a contract cannot be held liable where there is an express contract governing the same subject matter." Seneca Pipe & Paving Co. v. S. Seneca Cent. Sch. Dist., 63 A.D.3d 1556, 1557, 880 N.Y.S.2d 807, 808 (4th Dep't 2009) (quoting Feigen, 150 A.D.2d at 283, 541 N.Y.S.2d at 799). Because Handsman did not sign the Rentrak Agreement in his personal capacity and because Rentrak's unjust enrichment claim arises out of the same subject matter of the Rentrak Agreement, the Court finds that Handsman cannot be held liable on a quasi-contractual theory. Accordingly,

Handsman's cross-motion for summary judgment on Rentrak's unjust enrichment claim is GRANTED.

IV.  Rentrak's Breach of Fiduciary Duty Claim

Both parties have also cross-moved for summary judgment on Rentrak's breach of fiduciary duty claim.  As discussed below, both parties' motions in this regard are DENIED.

Rentrak claims that Video U.S.A. breached its fiduciary duties when it failed to hold in trust and remit to Rentrak the revenue sharing funds generated by Video U.S.A.'s rentals and sales of Rentrak's products.  (Am. Compl. ¶¶ 29-32.)  Citing New York law, Rentrak seeks to hold Handsman personally liable for this alleged breach because, according to Rentrak, "corporate officials may be held personally liable for a corporation's . . . breach of fiduciary duty through misappropriation of trust funds."  (Pl.'s Br. at 21.)  Before the Court can decide whether Handsman may be held liable for Video U.S.A.'s breach of fiduciary duty, however, the Court must determine (a) whether Video U.S.A. did in fact owe a fiduciary duty to Rentrak, and if so, (b) whether Video U.S.A. breached that duty.  Although the parties cite exclusively to New York law, the Court is not convinced that New York law, as opposed to Oregon law, would apply to these questions because Rentrak claims that Video U.S.A. owed fiduciary duties to Rentrak pursuant to section 9.7 of the Rentrak Agreement, which, as previously noted, contains an Oregon choice-of-law provision.  As neither

party has addressed this issue, the Court, in its discretion, TEMPORARILY DENIES both parties' motions for summary judgment on the breach of fiduciary duty claim. The Court will consider supplemental briefing as to this issue.

V.   Handsman's Attorneys' Fees Claims

Because the Court has granted summary judgment in favor of Rentrak, Handsman's motion for summary judgment on its attorneys' fees claims is DENIED AS MOOT.

VI.  Rentrak's Punitive Damages Claim

Finally, although neither party has moved with respect to Rentrak's punitive damages claim, the Court sua sponte DISMISSES the claim because it is meritless. It is well settled under New York law that punitive damages may not be asserted as a separate cause of action. Martin v. Dickson, 100 F. App'x 14, 16 (2d Cir. 2004) (affirming district court's dismissal of separate cause of action for punitive damages because "there is no separate cause of action in New York for punitive damages"); Weir Metro Ambu-Serv., Inc. v. Turner, 57 N.Y.2d 911, 912, 442 N.E.2d 1268, 1268, 456 N.Y.S.2d 757, 757 (1982) ("[P]unitive damages may not be sought as a separate cause of action."); Paisley v. Coin Device Corp., 5 A.D.3d 748, 750, 773 N.Y.S.2d 582, 583 (2d Dep't 2004) (dismissing cause of action for punitive damages because "no separate cause of action for punitive damages lies for pleading purposes").

Accordingly, Rentrak's punitive damages claim is DISMISSED WITH PREJUDICE.

## CONCLUSION

For the foregoing reasons, Rentrak's and Handsman's motions for summary judgment are GRANTED IN PART and DENIED IN PART.

Rentrak's motion for partial summary judgment on its conversion claim is GRANTED, and Handsman's motion for summary judgment on the conversion claim is DENIED.

Handsman's motion for summary judgment with respect to Rentrak's unjust enrichment claim is GRANTED.

Both parties' motions for summary judgment with respect to Rentrak's breach of fiduciary duty claim are TEMPORARILY DENIED and the parties may submit supplemental briefing on the choice of law issue identified by the Court herein.  If they choose to do so, the parties shall file such briefing within thirty (30) days of the date of this Memorandum and Order.

Finally, Rentrak's punitive damages claim is <u>sua</u> <u>sponte</u> DIMISSED WITH PREJUDICE.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    March __31__, 2014
          Central Islip, NY